## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ROBERT L. BOBB,

      Plaintiff,

                                 **Civil Action 2:19-cv-5612**
      v.                            **Judge Michael H. Watson**
                                 **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Robert L. Bobb, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 7).  For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.    BACKGROUND

Plaintiff filed his application for benefits in December 2013, alleging that he has been disabled since November 30, 2013, due to thoracic spine disc degeneration, chronic lumbar pain,

neck pain, hyperlipidemia, GERD, learning problems, difficulty reading, mitro valve disorder, acid reflux, and high blood pressure. (R. at 357-60, 391.) Plaintiff's application was denied throughout the administrative process. Plaintiff's first administrative hearing, at which he appeared and testified, was held on January 19, 2016. (R. at 138-57.) Administrative Law Judge ("ALJ") Terry Banks issued an unfavorable hearing decision on March 4, 2016. (R. at 208-20). The Appeals Council granted the request for review, vacated the hearing decision of March 4, 2016, and remanded the case for further proceedings. (R. at 226-29.)

On August 31, 2017, ALJ Timothy G. Keller held a second hearing. Plaintiff, again represented by counsel, appeared and testified. (R. at 168-78.) ALJ Keller issued an unfavorable decision on September 29, 2017. (R. at 86-131.) Plaintiff appealed that decision. This Court granted the parties' joint motion to remand by Order dated December 20, 2018. (R. at 1396-1400.)

Following remand (R. at 1401-06), ALJ Keller held a third hearing on August 13, 2019, at which Plaintiff, represented by counsel, appeared and testified. (R. at 1331-43.) On August 26, 2019, ALJ Keller issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 1299–1318.) It appears Plaintiff did not pursue an additional Appeals Council review, opting instead to file suit directly with this Court. (ECF No. 3.)

## II.   HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified at his initial administrative hearing in January 2016 that he lived with his wife and 14-year-old child. (R. at 139.) He last had driven more than a year prior to that

hearing.  (*Id.*)  When asked why he no longer drove, Plaintiff responded, "I can't sit in the seat very much and I keep moving around.  I just lay in bed.  I don't even go anywhere anymore."  (R. at 139.)  He testified that he had not worked since November 2013 due to back pain.  (R. at 140, 145-146.)  He left his last job after his boss urged him to quit because he was always missing work.  (R. at 142.)  Plaintiff further testified that, at that point, he was going to a chiropractor every day.  (*Id.*)  He explained that some days he needed a ride to his truck at the end of the day because he could not walk.  (R. at 143.)  At the time of this hearing, the only treatment he received for his back pain was the medication, Percocet.  (R. at 144.)  Plaintiff stated that his doctor prescribed a wheelchair because his legs were "giving out" and he used this wheelchair to go to the doctor.  (R. at 152, 154-55.)  Plaintiff confirmed that he graduated from high school but stated that he is unable to read or write.  (R.  at 148.)  He explained that he was in special education classes while in school, but he basically did not have to do anything.  (R. at 147.)   At home, his wife takes care of the bills.  (*Id.*)  He lies in bed all day.  (*Id.*)

At the second administrative hearing on August 31, 2017, Plaintiff testified that he is not able to stand or walk at all.  (R. at 171.)  He also testified that his back pain is so severe with standing, that his legs give out and he has to hold on to something.  (*Id.*)  Plaintiff explained that his wife helps him with bathing and that he has a shower chair.  (*Id.*)  He had not gone to the grocery store in "almost four years" prior to this hearing.  (R. at 171-72.)  Plaintiff testified that if he does not have access to his wheelchair, he is unable to hold his body up.  He also explained that he has tried to get three MRI's performed but he "can't lay on [his] back long enough to get it done."  (R. at 172.)

At the administrative hearing on August 13, 2019, Plaintiff testified in his wheelchair. He confirmed that he was prescribed his wheelchair in 2014.  He stated that he cannot stand at all.  (R. at 1335.)   He explained that, if he does try to stand, he uses "a crutch or hold[s] on to somebody."  (*Id.*)  He further elaborated that, if he tries to stand too long, his knees" will give out."  (*Id.*)   He testified to spending "at least half" of a normal day with his legs elevated.  (R. at 1336.)  When asked about sleeping, he replied, "I don't sleep hardly."  (R. at 1337.)

### III.    MEDICAL RECORDS

#### A.    Carl Schowengerdt, M.D.

Dr. Schowengerdt is Plaintiff's primary care physician.  Dr. Schowengerdt's records from July 2013, indicate that Plaintiff complained of back pain that radiated down both legs and leg weakness with pain.  Dr. Schowengerdt noted Plaintiff had a history of recurrent self-limited episodes of low back pain in the past.  (R. at 545.)  Plaintiff's pain had worsened since onset and he was using Vicodin he obtained from family members.  Plaintiff also treated with a chiropractor but this did not help.  Sometimes Plaintiff wore a lumbar support brace.  (*Id.*)  On examination, Plaintiff had a tender lower back.  (R. at 546.)

An x-ray of Plaintiff's lumbar spine taken on July 30, 2013, showed loss of intervertebral disk space at L2-L3 and L5-S1 and grade 1 retrolisthesis of L3 on L4.  (R. at 559.)

Dr. Schowengerdt's treatment notes consistently document pain that was described as aching, sharp, stabbing, knife-like, burning and throbbing, radiating to the bilateral lower extremities, with numbness and tingling in the thighs and legs.  (R. at 663-82; 721- 38.)   On

examination, Plaintiff exhibited tenderness in his lower back.  (*Id.*)  Dr. Schowengerdt prescribed

Plaintiff pain medication.  (R. at 666.)

Plaintiff underwent an MRI of his lumbar spine on August 15, 2013, which showed

degenerative disc disease with mild degenerative facet joint changes at multiple levels of the

spine from L1-2 through L5-S1.  There was evidence of disc bulges at the L2-3, L3-4, L5-6 and

L5-S1 levels.  At the L2-3 level, the study showed signs of a disc bulge that indented the ventral

thecal sac, with narrowing measured to be 11 mm in the AP dimension.  The study also

demonstrated the presence of cerebrospinal fluid signal among the nerve roots at this level,

indicating that no nerve tissue was inherently affected by the bulging disc's contact with the

thecal membrane at this level.  The MRI also showed mild bilateral foraminal narrowing at the

L2-3 level, without signs of significant canal stenosis.  At the L3-4, L4-5 and L5-S1 levels, the

MRI revealed evidence of disc bulges and mild facet joint changes accompanied by mild to

moderate bilateral neural foraminal narrowing.  There was no evidence of focal disc herniation

or significant central spinal canal narrowing at any level.  (R. at 501.)

Plaintiff saw Dr. Schowengerdt for an MRI follow up on September 24, 2013.  Dr.

Schowengerdt noted that Plaintiff's job involved heavy lifting in a junk yard salvage operation.

Plaintiff reported going to the chiropractor two to three times a week without improvement in his

pain.  He stated the pain radiated down his right leg and caused his right leg to go numb at times.

Dr. Schowengerdt reviewed the MRI and assessed Plaintiff with chronic lumbar pain.  Dr.

Schowengerdt prescribed Vicodin under a narcotic pain medication agreement.  (R. at 549-50.)

In November 2013, Plaintiff continued to complain of back pain, describing it as "knife-like, burning and stiffness."  Dr. Schowengerdt assessed Plaintiff with chronic lumbar pain, thoracic back pain, and neck pain and increased his Vicodin.  (R. at 555-56.)

 In February 2014, Plaintiff rated his pain severity at a level of 8 on a 0-10 visual analog scale.  He stated that the pain medication he was taking "is just like water."  He requested something stronger.  Dr. Schowengerdt increased the pain medication.  (R. at 675-76.)  When seen in March 2014, Plaintiff requested crutches from Dr. Schowengerdt.  His mid and lower back muscles were tight on examination.  Dr. Schowengerdt gave Plaintiff crutches.  (R. at 679-80.)  A week later, Plaintiff stated he stopped taking Oxycodone due to nausea and vomiting.  Dr. Schowengerdt requested that Plaintiff bring in the pill bottle for count and stated that if the count was acceptable, he would place Plaintiff on Norco.  (R. at 682.)  An x-ray of the thoracic spine taken on March 20, 2014, showed slight loss of height at T7, mild anterior wedging at T8 and mild loss of height at T9 (25% loss of height at all 3 levels), and spondylosis in the mid/lower thoracic spine.  (R. at 684.)

In May 2014, Dr. Schowengerdt ordered a wheelchair for Plaintiff.  (R. at 757.)  In August 2014, Dr. Schowengerdt found that Plaintiff had no musculoskeletal tenderness on examination. (R. at 1191.)  Dr. Schowengerdt found that Plaintiff's back was tender in February and May 2015 (R. at 1162, 1179), and December 2016.  (R. at 1132.)

In August 2017, Dr. Schowengerdt opined that Plaintiff required a wheelchair and was not able to walk a block at a reasonable pace on rough or uneven surfaced.  (R. at 473.)

**B.     David Schroder, D.C.**

Plaintiff received chiropractic treatment from Dr. Schroder.  On initial examination for his low back pain in September 2004, Dr. Schroder found pinched nerves, muscle spasms, and inflammation.  (R. 616-17.)  Dr. Schroder noted that chiropractic adjustments initially offered Plaintiff relief but became less effective.  (R. at 613.)

On December 17, 2012, while completing a Case History Update, Plaintiff reported that he believed he hurt his back while packing a transmission at work.  (R. at 499.)

On March 14, 2013, Plaintiff reported that his neck and thoracic back pain was much improved since his last treatment.  At that time, Plaintiff's back pain was quiescent.  Plaintiff returned for thoracic and cervical spine pain multiple times throughout 2013-2015.  Dr. Schroder's treatment notes show that he consistently found Plaintiff to be experiencing muscle spasms, edema, tenderness in the upper and middle thoracic spine which radiated, inflammation, and pain to palpation specific to the left and right lower lumbar range.  (R. at 625-47, 869-77.)

On January 23, 2014, Dr. Schroder reported that orthopedic testing was positive for nerve impingement and limited range of motion in the spine with obvious edema.  (R. at 622.) Dr. Schroder suspected that Plaintiff suffers from degenerative disc disease which he had seen on x-rays.  He believed that Plaintiff was "unable to work due to severe chronic pain."  (R. at 623.)

Dr. Schroder opined in May 2014 that Plaintiff was unable to sustain any work.  (R. at 630.)

C.      Yahya Bakdalieh, M.D.

Plaintiff consulted with pain management specialist, Dr. Bakdalieh with complaints of mid and lower back pain in November 2015.  Plaintiff reported that he had experienced symptoms since 2004 but that lately the symptoms were getting worse.  He rated his pain in the lower back area at 5 out of 10.  (R. at 1119.)  Dr. Bakdalieh found Plaintiff had tenderness in his lower back, mild limitations in range of motion due to Plaintiff's poor effort, and 80% muscle strength.  (R. at 1122.)  He prescribed chlorzoxazone for muscle spasms and recommended facet joint steroid injection.  (R. at 1123.)

In January and February 2017, Plaintiff exhibited tenderness in his lower back, full strength in his legs, and a negative straight leg test.  (R. at 1105, 1092.)  Plaintiff received a branch block to his lower back in February 2017.  (R. at 1201.)   Later in February, Plaintiff reported to Dr. Bakdalieh that he had experienced no relief from that branch block.  (R. at 1226.)  Dr. Bakdalieh found that Plaintiff had tenderness in his lower back, range of motion in his lower back within functional limits, and full strength in his legs.  (R. at 1230.)  Dr. Bakdalieh administered a steroid injection to Plaintiff in March 2017.  (R. at 1252.)

A May 19, 2017, MRI of Plaintiff's lumbar spine showed no critical spinal canal stenosis or neuroforaminal narrowing at the L1-2 level. At the L2-3 level, there were signs of a mild diffuse disc bulge that indented the thecal sac and abutted the ventral aspect of the spinal cord, along with noncritical neuroforaminal narrowing that did not result in more than mild spinal canal stenosis, measuring approximately 8 mm in the AP dimension.  At the L3-4 level, there was a mild disc bulge that did not result in critical neuroforaminal narrowing or significant spinal

stenosis. The radiologist documented there were no spinal cord signal or bone marrow signal abnormalities, and Plaintiff's lumbar vertebral bodies appeared to have normal alignment with preserved vertebral body height. (R. at 1561.)

**D.      Jeffrey Lobel, M.D.**

Plaintiff consulted with a neurosurgeon, Dr. Lobel, in August 2017 with complaints of low back pain with radiation into the lower extremities. (R. at 1548.) After reviewing Plaintiff's MRI, Dr. Lobel determined that he had "mild degenerative changes without any acute pathology to explain the extreme nature of his pain." (R. at 1549.) Dr. Lobel ordered a thoracic spine MRI due to a prior lesion. (R. at 1551.) Dr. Lobel found that Plaintiff had no evidence of cord compression, and that there was no explanation for why he was wheelchair bound. (R. at 1543.)

At Plaintiff's follow-up appointment in January 2018, Dr. Lobel found reproducible pain to light touch from the cervical spine down to the lumbar sacral junction, and decreased range of motion in both lower extremities. Dr. Lobel also noted that, although Plaintiff was sitting in a wheelchair, he exhibited no wasting in his lower extremities. (R. at 1535.)

An April 2018 MRI taken of the thoracic spine showed that Plaintiff had mild spinal stenosis, and degenerative changes at T5-6 and T7-8, but no cord signal abnormalities. (R. at 1658.)

**E.      Safdar Khan, M.D.**

In August 2018, Plaintiff consulted with Dr. Khan, an orthopedic surgeon at the OSU Comprehensive Spine Center, with complaints of chronic axial back pain. Plaintiff arrived in a wheelchair, noting sedentary activity most of the day. Plaintiff stated he was only able to walk a

few steps and admitted to decreased walking tolerance. Plaintiff denied gait instability or fine motor change.  He explained that his pain was limiting a lot of his daily activities and was located over the entire axial spine.  His pain radiated distally.  Plaintiff noted various arm and leg paresthesias that were non-dermatomal.  He confirmed he did not have night pain.  Plaintiff reported his pain was better with medications and worse with nighttime and walking.  Overall, Plaintiff described his pain as worsening and constant.  Plaintiff did not have neurovascular complaints and had not had prior spine surgery.  (R. at 1653.)

On examination, Dr. Khan found edema and a limited range of motion with pain in Plaintiff's lumbar spine.  Plaintiff had full range of motion without pain or tenderness in his cervical spine, along with full muscle strength.  Dr. Khan described Plaintiff's gait deficits as labored antalgic.  (R. at 1655.)  Dr. Khan ordered a lumbar spine MRI which showed disc desiccation, annular bulge, facet hypertrophy, and central disc protrusion.  Dr. Khan indicated that Plaintiff was not a surgical candidate.  (R. at 1652.)

## IV.  ADMINISTRATIVE DECISION

On August 26, 2019, the ALJ issued his decision.  (R. at 1299-1318.)  The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2018.  (R. at 1301.)  At step one of the sequential evaluation process,[1] the ALJ found that through the date last insured, Plaintiff did not engage in substantially gainful during the period from his alleged onset date of November 30, 2013 through his date last insured of December 31, 2018.  (*Id.*)  The ALJ found that through the date last insured, Plaintiff had the severe impairments of degenerative disc disease of the spine, hypertension, obesity, bilateral knee arthritis, bilateral hearing loss, adjustment disorder, personality disorder not otherwise specified, learning disorder by history, and borderline intellectual functioning.  (*Id.*)  He further found that through the date last insured, Plaintiff did not have an impairment or combination of

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

11

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 1303.)  At step four of the sequential process, the ALJ

set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except never any climbing, never balancing, occasionally stooping, never kneeling, occasionally crouching, never crawling; no exposure to very loud noise; retains the ability to understand, remember and carry out simple repetitive tasks; able to respond appropriately to co-workers and supervisors in a task oriented setting with only occasional public contact and occasional interaction with coworkers; able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(R. at 1304-05.)

Relying on the VE's testimony, the ALJ found that through the date last insured,

Plaintiff's limitations precluded his ability to perform his past relevant work as a general scrap

worker and farm laborer.  (R. at 1316.)  The ALJ concluded that through the date last insured,

Plaintiff could perform other jobs that exist in significant numbers in the national economy.  (R.

at 1316-17.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act

at any time from November 3, 2013, the alleged onset date, through December 31, 2018, the date

last insured.  (R. at 1317.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff sets forth three contentions of error: (1) the ALJ failed to properly evaluate whether he met or equaled listing 1.04C;  (2) the ALJ improperly classified his spinal stenosis as

a non-medically determinable impairment; and (3)  substantial evidence does not support the

ALJ's formulation of the RFC under *Deskin*.  The Undersigned addresses each issue in turn.

## A.  Listing 1.04C

Plaintiff faults the ALJ for not finding that he met requirements of Listing 1.04C.  The

Undersigned disagrees and finds that the ALJ's conclusion is supported by substantial evidence.

A plaintiff's impairment must meet every element of a Listing before the Commissioner

may conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20

C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.

1986). The plaintiff has the burden to prove that all of the elements are satisfied. *King v. Sec'y of*

*Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). The regulations provide that in

making a medical equivalence determination, the Social Security Administration will "consider

the opinion given by one or more medical or psychological consultants designated by the

Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a . . . record .

. . complete and detailed enough to enable the Secretary to make a disability determination rests

with the [plaintiff]." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 363, 367 (6th Cir.

1989) (Commissioner's decision denying benefits affirmed where medical evidence "almost

establishes a disability" under Listing).

The ALJ found that Plaintiff's back impairment failed to meeting Listing 1.04, Disorders

of the Spine and provided this rationale:

> The objective findings on exam, testing, or imaging fail to support the criteria of
> any of the listings. As detailed later in this decision, the claimant's imaging and
> exam findings fail to support evidence of nerve root compression. He rarely had
> positive straight leg raises and they were not documented as being in both the sitting

and supine positions. Overall, he had negative straight leg raises. He almost always had full strength in his lower extremities with the rare exceptions usually due to less effort or "pain" limited. His objective findings fail to support all requirements for the 1.04 with no evidence of either spinal arachnoiditis or pseudoclaudication. This is carefully detailed in the treatment discussion below and incorporated herein by reference.

(R. at 1303.)

To meet Listing 1.04C, Plaintiff must show the impairment results in "compromise of a nerve root. . .or the spinal cord," along with: (1) "lumbar spinal stenosis resulting in pseudoclaudication;" (2) "established by findings on appropriate medically acceptable imaging;" (3) "manifested by chronic nonradicular pain and weakness;" that (4) "result[s] in inability to ambulate effectively, as defined in 1.00B2b." *Searer v. Comm'r of Soc. Sec.*, No. 3:18 CV 1035, 2019 WL 4126380, at *3 (N.D. Ohio Aug. 30, 2019) (quoting 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04C.)[2]

"Section 1.00B2b defines the fourth requirement -- the inability to ambulate effectively -- as 'an extreme limitation of the ability to walk.'" *Searer*, 2019 WL 4126380, at *3 (quoting 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.00B2b(1). "To be able to ambulate effectively, an individual must be able to sustain[ ] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living' and must be able to travel to and from work or school without assistance.'" *Id.* (quoting § 1.00B2b(2). "Section 1.00B2b(2) sets forth a non-exhaustive

---

[2]"Pseudoclaudication is defined as 'neurogenic claudication,' which is identified as 'limping or lameness' that is 'accompanied by pain and paresthesias in the back, buttocks, and lower limbs, relieved by stooping or sitting[.]'" *Clark v. Commissioner. Soc. Sec. Admin.*, No. 2:17-0041, 2018 WL 2336318, at *4 n.7 (M.D. Tenn. May 23, 2018) (quoting Elsevier Sauders *Dorland's Illustrated Medical Dictionary* 369, 1541 (32nd ed. 2012)).

list of examples of ineffective ambulation that includes 'the inability to walk a block at a reasonable pace on rough or uneven surfaces.'" *Id.*

Plaintiff contends that Dr. Schowengerdt's notes dated November 27, 2013, indicating that his 2013 MRI evidenced degenerative disc disease, annular tear, and nerve root compromises satisfies the threshold requirement of Listing 1.04. (R. at 555, 501.)[3] Plaintiff asserts that the ALJ's statement that no such evidence existed in the record is factually incorrect and, therefore, reversible error. The Commissioner concedes that the ALJ did not acknowledge Dr. Schowengerdt's comment regarding "nerve root compromises" but contends that this failure is, at most, harmless. The Undersigned agrees. As explained below, even assuming Dr. Schwoengerdt's notation constitutes sufficient evidence of nerve root compromises, the ALJ reasonably concluded that Plaintiff did not satisfy the remaining requirements of Listing 1.04C.

First, although Plaintiff presented some evidence of stenosis, this condition was limited to and consistently described as "mild." (*See, e.g.*, R. at 1558-1562; 1648-1658.)

Next, Plaintiff's evidence of pseudoclaudication was limited to self-reports of pain. Accordingly, the ALJ specifically stated that "objective findings fail to support all requirements for the 1.04 with no evidence of either spinal arachnoiditis or pseudoclaudication cited."  (R. at 1303.) Plaintiff's argument here relies only on subjective complaints thereby confirming the ALJ's characterization of the record on this issue. For example, Plaintiff contends that he "often described his pain to Dr. Schowengerdt and Dr. Khan as nondermatoma;" "often complained of

---

[3]Plaintiff's argument suggests that evidence of nerve root compression appears multiple times in the record. This is not accurate. The same exhibit appears in the record three times. (R. at 555, 671, 727.) Accordingly, Plaintiff's argument on this point rests on one comment contained in one progress note.

weakness in his legs and/or body;" "often described his lower back, leg, buttock, and/or thigh pain as bilateral;" and "often reported his pain as aggravated by walking or standing." (ECF No. 10 at 9.)

Further, the ALJ considered the evidence relating to Plaintiff's ability to ambulate and reasonably concluded that the requirements of § 1.00B2b had not been met. To be clear, the ALJ acknowledged Plaintiff's use of a wheelchair and consistent self-reports of trouble ambulating. However, against this evidence, the ALJ weighed imaging and examination results that he found to be inconsistent with these circumstances. (R. at 1305–06.); (*see also* R. at 679, 984, 1073–79, 1650, 1801.) Also, and not insignificantly, the ALJ cited Plaintiff's appearance at other appointments with a normal gait or without a wheelchair. (R. at 1309 (citing R. at 823–37)). The ALJ addressed this last point at great length in his discussion, portions of which are highlighted below:

> At his emergency department visit for chest pain on January 10, 2015, the claimant reported 0-1 pain (18F/7, 24) and did not appear to present in a wheelchair (18F). At one point, he was resting on the cart playing on his phone (18F/25). His testing was unremarkable and he was discharged with an antibiotic for bronchitis (18F/3). This is a contrast to his presentation in a wheelchair at his office visits for narcotics where he routinely reported high pain levels, sometimes appearing as if in pain, and always in a wheelchair (55F). The claimant was well appearing and in no distress at his emergency department visit on March 20, 2015 (28F/62). The claimant was also comfortable and in no acute distress with no mention of a wheelchair and normal neurological findings at his October 21, 2015 otolaryngology evaluation (21F). At this evaluation, he was diagnosed with bilateral sensorineural hearing loss, high frequency, with 80% discrimination on the right and 90% on the left. The claimant had normal muscle tone on July 24, 2015 (28F/36). The claimant was noted to have *a normal gait* at his July 30, 2015 evaluation with Dr. Smock for a renal cyst. His extremity findings were normal. There does not appear to be no mention of a wheelchair. He was advised that his simple left renal cyst was not the source of his left flank pain with his 7/24/15 computed tomography of his abdomen and pelvis reviewed. He was to follow-up in a year (20F).

17

At his January 15, 2016 visit for intermittent left flank pain and back strain, he had normal musculoskeletal and neurological findings, with no abnormal findings such as atrophy or loss of strength that would be expected with no use of his legs due to being wheelchair bound. For example, he was found to have normal strength, no cranial nerve deficits, normal coordination, with no edema, and only some subjective tenderness and pain regarding his thoracic spine without bony tenderness, swelling, edema, deformity or laceration. Most notably, *"he was able to ambulate to exam room with steady gait"* even though he arrived to the exam room via a wheelchair and denied numbness, tingling, weakness or bladder or bowel incontinence. He was noted to be uncomfortable with movement, with the claimant diagnosed with a back strain and gallstones (31F/28).

…

The claimant presented to the emergency department with back pain on December 27, 2016 "that does not radiate," claiming he fell from standing and landed on his buttocks, worsened by ambulation and bending and helped by nothing. He had rather normal findings with normal range of motion of the neck and lower extremities, no signs of external trauma to the lower back, no edema, no motor deficits, lower extremity strength at 5/5 bilaterally with reflexes 2+ and brisk. He had a normal mood and affect. The claimant had degenerative disc disease and facet arthropathy on x-rays with maintained vertebral body height and normal alignment (33F/21). However, it was conveyed to staff that the claimant was depressed and contemplating suicidal ideation and plans. When the claimant was told he was going to be admitted to the behavioral health unit, he immediately became agitated, "jumped out of bed, got in wheelchair and started to leave room." Public safety officers were called and the claimant got out of his wheelchair to fight the officers. It was noted that the claimant "had pushed one of the officers through a locked door in the hallway." He was then assisted back into his wheelchair and taken to the room with medications for his agitation. Thus, the claimant who claims many times that could not even stand or could not take more than a few steps, and was confined to his wheelchair due to severe back pain, was able to jump out of bed, get into his wheelchair, stand and engage in a physical fight with officers (33F/23-29).

…

The claimant had been referred to Dr. Lobel for his evaluation of his back pain, with a history of pain management. He followed up on January 19, 2018 without the thoracic spine magnetic resonance imaging ordered such that the doctor could offer no new recommendations. The claimant rated his back and neck pain at 8/10 and reported constant numbness and tingling to all four extremities with weakness

18

to all four extremities asserting that he uses a wheelchair everywhere he goes. Despite the reports of three years in a wheelchair there was no wasting in the lower extremities (42F/3). This doctor had previously written on 8/18/17, "This is a difficult case from the standpoint that I do not feel there is a strong surgical lesion which would offer him a maximal benefit and alleviate much the pain he's been experiencing that prevents him from functioning at a high capacity. There is no overt evidence of cord compression nor does he have any indicated condition radiographically or otherwise that he is experiencing cauda equine syndrome which would keep him wheelchair bound. I explained to both he and his significant other that surgical intervention would only be pursued by myself in the event I could find a clearcut lesion which would benefit him to a large degree. At this juncture I would like him to have the MRI scan of his thoracic spine but he states its [sic] best to be performed in an open scanner. We did reach out to the occupational health office and they state that they don't see patients who do not have new work-related injuries and therefore offering a functional capacity evaluation and the determination for his disability may be best pursued by either her primary doctor or another occupational specialist" (42F/11). The claimant was able to stand with extreme pain reported, with no evidence of muscle atrophy or wasting and power at 4+/5 globally with effort decreased secondary to pain report (42F/18). After the thoracic spine imaging was complete, it was noted that in review of all of the films with Mr. Bobb, "there is no clear-cut reason for the extensive nature of his back pain that we can identify." There was scoliosis in the thoracic spine, but it was unclear whether this could be causing the significance of the back pain he is experiencing. He was referred out for further evaluation.

(R. at 1309-1312.)

The ALJ's discussion above culminated in the following conclusion:

There is no objective support for the claimant's need to be confined to a wheelchair or to support a complete inability to stand at all as he alleged at the hearing. While denying any such ability at some exams, he ultimately admitted to being able to stand and walk, but claiming he could only manage a few steps, and did actually stand and walk at some visits. His complaints varied as to whether the pain radiated and to where, but he has routinely been found to be neurological intact. He had only slight deficits in strength when "pain limited," with subsequent exams supporting intact strength, range of motion, and many other normal findings on exam and testing. He had just a few positive straight leg raises, with most results negative. After the delayed back imaging was obtained, it did not provide support for radiating pain and weakness. His imaging was mild to moderate at worst, with no surgery ever recommended. He also alleged no benefit from any treatment at times, when other treatment notes reflect contrary reports of improvement in symptoms

with treatment. The records show that he was able to get out of the wheelchair and walk during some assessments. He was able to jump out of his wheelchair and engage in a physical fight with hospital security to the point of throwing one of them through a locked door. Furthermore, if he had been in a wheelchair for over five years, exam findings should have reflected loss of muscle tone, atrophy, and weakness, but no such findings were reflected. After thorough assessments, there was no cause identified for his "wheelchair confinement." As for his knees, the claimant had already claimed he was confined to a wheelchair for years prior to the knee problems. Although the knee fluid was drained at times, his radiology has been mild and his objective findings mild to normal with conservative only treatment recommended. His very recent magnetic resonance imaging was noted to reflect some torn cartilages along with the known arthritis, which was considered along with his other impairments in limiting him to a sedentary residual functional capacity.

(R. at 1312-1313.)

 Plaintiff complains that the ALJ erred in the above conclusion because the ALJ did not consider evidence postdating his wheelchair prescription in May 2014. (ECF No. 10 at 11.) This characterization of the record is inaccurate.  As even a cursory read of the ALJ's decision reveals, the ALJ considered significant evidence throughout his decision showing that the post-May 2014 objective evidence, including physical examinations and imaging evidence, did not support Plaintiff's need for a wheelchair. (R. at 1308 (citing R. at 823–27, 981, 984, 1558–62, 1648–58)).

At its core, Plaintiff's argument on this issue is that the ALJ should have weighed the evidence differently.  The law in the Sixth Circuit is clear that a court cannot reweigh evidence considered by the ALJ.  Consequently, the Court declines to do so here. *See Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013) (internal quotations and citations omitted) ("Here, the [plaintiff] asks us to reweigh the evidence and substitute our judgment for that of the ALJ. We cannot do so. Even if we would have taken a different view of the evidence were we

the trier of facts, we must affirm the ALJ's reasonable interpretation.").  Even if there is

substantial evidence or indeed a preponderance of the evidence to support a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469,

477 (6th Cir. 2003).  Here, the ALJ's findings are supported by substantial evidence within his

"zone of choice."  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *see also Mackey v.

Comm'r of Soc. Sec*., No. 16-6743, 2017 WL 6028679, at *4 (6th Cir. 2017) ("Moreover, substantial

evidence supports the ALJ's determination that Mackey did not meet the criteria for Listing 1.04, and

thus we defer to the ALJ's findings even if the record could also support an opposite conclusion.").

For all of these reasons, Plaintiff's first contention of error is without merit.  It is therefore

**RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**

### B.  Plaintiff's Spinal Stenosis

Plaintiff next contends that the ALJ erred when he failed to recognize and therefore consider

Plaintiff's spinal stenosis as a medically determinable impairment. (ECF No. 10 at 14-19.)

Plaintiff specifically argues that the ALJ's failure in this regard "significantly prejudiced [his]

claim as the RFC was created without any consideration at all of [his] spinal stenosis."  (*Id*. at

19.)

Plaintiff's argument is not well taken. The ALJ is required to consider all objective medical

evidence in the record where such evidence is produced by an acceptable medical source. 20

C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513; *Minor v. Comm'r of Soc. Sec.*, No. 12-1268, 2013

WL 264348, *16 (6th Cir. Jan. 24, 2013).

In addition, in formulating a RFC, the ALJ is required to consider "all the relevant medical and other evidence in [the] case record," including evidence of impairments that are not considered to be "severe" at step two of the sequential evaluation process. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184 at *5 (1996)) ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.' ") (emphasis in original). A failure of the ALJ to consider all of a claimant's records or symptoms in developing an RFC generally constitutes reversible error. *Cf. Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. 2012) (finding no reversible error in the RFC determination "because the ALJ considered all of the symptoms that were consistent with the medical evidence in determining his residual functional capacity"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (concluding that reversal is required where the agency fails to follow its own procedural regulations where the regulation is intended to protect claimants). Further, "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson*, 378 F.3d at 545. Even if the aggrieved party appears to have little chance of success on the merits, courts generally will not find the procedural error to be harmless. *Id.* at 546. "To hold otherwise . . . would afford the Commissioner the ability to violate the regulations with impunity and render the protections promised therein illusory." *Id.*

Further, at step two of the sequential evaluation, a plaintiff must show that he suffers from a "severe impairment" in order to warrant a finding of disability. *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 534 (6th Cir. 2001). A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). "Upon determining that a claimant has one severe impairment the ALJ must continue with the remaining steps in the disability evaluation." *Hobbs v. Comm'r of Soc. Sec.*, No. 1:14-cv-121, 2015 WL 4247160, at *5 (W.D. Mich. July 13, 2015) (citing *Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987)). "Once the ALJ determines that a claimant suffers from a severe impairment, the fact that the ALJ failed to classify a separate condition as a severe impairment does not constitute reversible error." *Hobbs*, 2015 WL 4247160 at *5 (citing *Maziarz,* 837 F.2d at 244). An ALJ can consider non-severe impairments in determining the RFC. *Id.* "The fact that some of [the claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. 2008).

Here, the ALJ found that Plaintiff had severe impairments of degenerative disc disease of the spine, hypertension, obesity, bilateral knee arthritis, bilateral hearing loss, adjustment disorder, personality disorder not otherwise specified, learning disorder by history, and borderline intellectual functioning.  (R. at 1301.) While the ALJ did not specifically classify spinal stenosis as a severe or non-severe impairment, the ALJ nevertheless went on to consider Plaintiff's allegations of back pain in his discussion and at the remaining steps of the disability determination, including when assessing his functional limitations. (R. at 1305-1316.)

Accordingly, the ALJ's failure to include spinal stenosis as an additional severe impairment at step two is legally irrelevant. *Anthony,* 266 F. App'x at 457; *Maziarz,* 837 F.2d at 244. Even if the ALJ erred by failing to find spinal stenosis a medically determinable impairment, the error is harmless. In addition to the reasons above, references to spinal stenosis in the record simply reflect a diagnosis of this condition. (*See, e.g.*, R. at 53, 56, 57, 59, 67, 73, 74, 675, 731, 1230, 1263, 1268, 1271, 1533, 1545, 1546.) For the reasons previously discussed, however, the "mere diagnosis" of spinal stenosis says nothing about the severity of the condition. *Higgs*, 880 F.2d at 863; *see also Malicoat*, 2019 WL 1305861, at *1; *Robinson*, 2019 WL 342432, at *10. If the Court remanded the case and the ALJ resolved this issue in Plaintiff's favor by finding that spinal stenosis was a medically determinable but non-severe impairment,

> which is the best result Plaintiff could hope for were the case to be remanded—the key question would then be "whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence." *See Rose v. Comm'r of Soc. Sec.*, 2015 WL 6735313, at *5 (S.D. Ohio Nov. 4, 2015), *adopted and affirmed*, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015). Where, as here, Plaintiff identifies no such limitations, and it is not apparent that any exist, the error made by the ALJ is harmless. It would certainly be better practice were an ALJ to say explicitly which impairments are found to be non-severe and which are found not to be medically determinable, but ordering a remand for clarification of that question when the ALJ's residual functional capacity finding would not change would be an exercise in futility.

*Rouse v. Comm'r of Soc. Sec.*, No. 2:15-cv-0223, 2017 WL 163384, at *4–5 (S.D. Ohio Jan. 17, 2017), *report and recommendation adopted*, No. 2:16-cv-0223, 2017 WL 1102684 (S.D. Ohio March 24, 2017) (finding that even though error had occurred it did not justify a remand). It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

**C.  The RFC**

Plaintiff argues that the ALJ made RFC determinations based on medical source opinions that did not contain functional limitations, and formulated the RFC using outdated medical source opinions that did not consider a critical body of objective medical evidence. The Undersigned disagrees and finds that the ALJ's RFC was supported by substantial evidence.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and

describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Plaintiff's argument relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008).[4]  The Undersigned finds that *Deskin* is neither controlling nor persuasive under the circumstances here.  The ALJ did not rely on outdated medical evidence and did not formulate Plaintiff's RFC without the benefit of medical source opinions.

As an initial matter, the ALJ's consideration of the medical evidence of record was not limited to the opinions of Dr. Schroder and state agency consultants Drs. Gallagher and Klyop identified by Plaintiff.  Indeed, these opinions were far from the extent of the medical evidence on which the ALJ relied.  By way of example, the ALJ considered progress notes from Dr. Jeffrey Lobel in 2017 and 2018 indicating that Plaintiff exhibited no evidence of wasting in the lower extremities (R. at 1535);  Plaintiff's MRI results were consistent when compared to previous radiographic studies (R. at 1540-1541); an MRI scan of Plaintiff's lumbar spine

---

[4] *Deskin* potentially applies in only two circumstances: 1) when an ALJ made an RFC determination based on no medical source opinion; or 2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Falkosky v. Comm'r of Soc. Sec.,* No. 1:19-CV-2632, 2020 WL 5423967, at *5 (N.D. Ohio Sept. 10, 2020) (citing *Kizys v. Comm'r of Soc. Sec.,* No. 3:10-cv-25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011)).  '*Deskin* and *Kizys* also acknowledge that "an ALJ may make a residual functional capacity finding without a physician's assessment 'where the medical evidence shows relatively little physical impairment.'" *Id*. (quoting *Kizys,* 2011 WL 5024866, at *3 and citing *Deskin,* 605 F. Supp. 2d at 912.))

,

demonstrated mild degenerative changes without any acute pathology to explain the extreme nature of his pain (R. at 1549); and there was no clear-cut neurosurgical cause to his pain. (R.at 1551.) The ALJ also considered continuing treatment notes from Plaintiff's family physician, Dr. Schowengerdt, indicating ongoing pain management for subjective complaints of chronic back pain throughout 2017. (R. at 1282-1295.) Additionally, the ALJ considered evidence of treatment Plaintiff received in 2018 for bilateral knee pain. (R. at 1746-1749.) Finally, the ALJ reviewed records from the OSU Spine Treatment Center in 2018 confirming mild spinal stenosis and indentation of ventral spinal cord at T5-6 and T7-8, without cord signal abnormality. (R. at 1648-1659.) Notably, the ALJ's thorough review of additional records led him to adopt a more restrictive RFC limited to sedentary work over the restriction to medium exertional work that the state agency reviewers had proposed.

In undertaking this comprehensive review of the record, the Court is not persuaded that the ALJ impermissibly interpreted "raw medical data" when formulating the RFC. (R. at 21, 24). Notably, "the ALJ is charged with the responsibility of determining the RFC based on his evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). " '[T]o require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.' " *Shephard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017) (quoting *Rudd*, 531 F. App'x at 728); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir.

2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.") (citing *Shepard*, 705 F. App'x at 442–43; *Rudd*, 531 F. App'x at 728); *Kidder v. Comm'r of Soc. Sec.*, No. 1:18-CV-661, 2020 WL 1080413, at *5 (S.D. Ohio Mar. 6, 2020), *report and recommendation adopted*, No. 1:18-CV-661, 2020 WL 5201080 (S.D. Ohio Sept. 1, 2020) (an ALJ does not interpret the medical findings when citing to treatment records and objective evidence). Accordingly, the ALJ did not impermissibly interpret raw medical data when formulating the RFC.

Finally, substantial evidence supports the ALJ's RFC determination. As set forth above, the ALJ reasonably considered the consistent medical evidence reflecting, *inter alia*, mild degenerative changes of the lumbar spine without any acute pathology to explain the extreme nature of Plaintiff's pain (R. at 1311-1312) when explaining how he determined the physical limitations in the RFC. *See Smith v. Comm'r of Soc. Sec.*, No. 1:14-cv-304, 2015 WL 2238150, at *8 (S.D. Ohio May 12, 2015) (finding that substantial evidence supported RFC where the record reflected, *inter alia*, " 'unremarkable objective findings,' such as a 'normal' cervical spine, with 'an almost complete recovery from prior [spine] surgery, that she could heel and toe walk, that she walked with a normal gait, that she had normal hips, ankles, and feet, and that she exhibited no muscle atrophy[,]' intact sensory function and other 'normal' or 'mild' clinical findings").

For all of these reasons, Plaintiff's third contention of error is not well taken. It is therefore **RECOMMENDED** that Plaintiff's third contention of error be **OVERRULED**.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:      December 28, 2020                          ____/s/ *Elizabeth A. Preston Deavers*
                                                      Elizabeth A. Preston Deavers
                                                      Chief United States Magistrate Judge